FILED
02/19/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 2, 2020

**IN RE ARCHER R.**

**Appeal from the Chancery Court for Montgomery County**
**No. MC-CH-CV-AD-18-46      Ted A. Crozier, Judge**

_____

**No. M2019-01353-COA-R3-PT**

_____

A mother and stepfather filed a petition seeking to terminate the parental rights of a father based on abandonment by failure to visit and failure to support his child. The trial court found the petitioners proved the ground of abandonment by failure to support by clear and convincing evidence but did not prove the ground of abandonment by failure to visit because the mother interfered with the father's attempts to visit the child. The trial court then found it was not in the child's best interest for the father's parental rights to be terminated and denied the petition to terminate. The mother and stepfather appealed, and we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and CARMA DENNIS MCGEE, JJ., joined.

Katie Bell Klinghard, Clarksville, Tennessee, for the appellants, K.T. and T.T.

Taylor Robinson Dahl, Clarksville, Tennessee, for the appellee, J.R.

**OPINION**

I. FACTUAL AND PROCEDURAL BACKGROUND

Archer R. was born to K.T. ("Mother") and J.R. ("Father") in December 2016. Mother and Father were living together in Murfreesboro when Archer was born, but they were not married. Mother asked Father to move out at the end of December 2016, and Father complied. Father remained in Murfreesboro until sometime in April 2017, when he moved to Illinois to be closer to his family.

Mother married T.T. ("Stepfather") in December 2017 and asked Father to terminate his parental rights to Archer so that Stepfather could adopt him. When Father refused to give up his rights voluntarily, Mother and Stepfather filed a Petition for Termination of Parental Rights and Step-Parent Adoption on July 6, 2018, in Chancery Court. Mother and Stepfather alleged that Father had abandoned Archer by failing to visit him or contribute toward his support during the relevant four-month period and that his parental rights should be terminated pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i). Mother and Stepfather's attempts to serve Father with the petition in August, September, and October were unsuccessful. In December 2018, Mother and Stepfather ultimately served Father's attorney, who accepted service on Father's behalf.

Unaware of the petition to terminate his parental rights, Father initiated his own action in Juvenile Court on November 27, 2018, when he filed a Petition to Establish Paternity and Permanent Parenting Plan. Once he became aware of Mother and Stepfather's petition in Chancery Court, Father filed a Motion for Immediate Visitation in Chancery Court. On December 21, 2018, the trial court held a hearing on Father's motion and entered an order stating that it would not grant Father visitation while the termination action was pending.

## The Trial

The parties tried the case on June 4, 2019. Father testified that once he moved out of Mother's apartment at the end of December 2016, when Archer was just two weeks old, he continued to see Archer about once a week. Father moved to Illinois in early May 2017, and he was able to continue seeing Archer via FaceTime. Father testified that he would also phone Mother to ask about Archer. According to Father, his communication with Mother about Archer continued until Archer's first birthday, when everything changed:

> [O]n the day of his birthday, I had pictures sent to me of him eating cake. And then after that, communication quit. . . . [Mother] quit responding. My texts quit being delivered. And when I'd try to call, it would ring once and go to voicemail.

Father testified that he tried to see Archer in 2017, but Mother refused to give Father a time when he could see Archer that worked with Father's schedule. Father introduced into evidence text messages between him and Mother dating from February and March 2017 to support this testimony. Father was living in Illinois from March to July of 2018, and he testified that he asked to come down to visit with Archer on two different occasions. Mother refused to arrange a time for Father to see Archer, and she refused Father's requests for photos of Archer. Emails from Father to Mother dated June 7 and June 14, 2018, were introduced into evidence. In each of these emails, Father

- 2 -

asked Mother to set up a time when he and his other child, Lilliana (Archer's half-sister), could see Archer. In the June 14 email Father wrote:

> [I]t's [Father,] just wanted to know if we could figure out a time between June 30 and July 7th so maybe I could get my kids together to see each other and so they can see their dad together[;] if you can just reply and let me know it would be greatly appreciated[.]

When asked whether he gave Mother money for Archer's support, Father responded that he offered to give Mother money for Archer in 2017:

> I asked her, you know, what she wanted and how often she wanted it, and she told me she wasn't worried about it due to my debts and housing and child support for my other child.

Father testified that he paid half of one of Archer's medical bills in the spring and summer of 2017. Father testified that he also gave Mother diapers and "stuff" for Archer that was from him and his mother "a couple of times" in or about 2017.

In December 2017, shortly after Archer turned one year old, Mother married Stepfather and moved to Clarksville. Mother began emailing Father in April 2018. At first she just asked for his mailing address. She then sent several emails in May and June 2018 asking Father to give up his rights to Archer so that Stepfather could adopt him. Father responded that he wanted the best for Archer and asked Mother to send him some photos of the child. Father did not agree to give up his rights to Archer. Father testified that he wanted to remain Archer's father, to have the opportunity to see him, and to be involved in his life.

Father testified that he contacted his attorney in August 2018 about filing papers with a court so he could be awarded visitation with his son. Father was not aware that Mother and Stepfather had filed their petition to terminate his rights two months earlier because he had not yet been served with the petition. He did not learn of the termination petition until after he filed his petition seeking visitation with Archer in Juvenile Court.

Mother acknowledged that Father asked to see Archer in 2017. She testified that she was working when Father wanted to see their child. Mother denied blocking Father's phone calls or emails. Mother testified that Father did not send her any money, pay any bills, or send her any supplies for Archer in the four months leading up to the date she and Stepfather filed their termination petition.

Following the presentation of all the evidence, the trial court made the following findings of fact, among others:

- 3 -

5. Following [Mother's] and [Father's] separation at the end of 2016, [Father] continued to reside in Murfreesboro, Tennessee until late April 2017. During this time period in which both parties resided in Murfreesboro, [Father] visited the minor child at [Mother's] home approximately once per week.

6. The Court was troubled by Mother stating in her testimony that she "allowed" Father to come to the house and see the minor child when they resided in Murfreesboro. This was a portion of her testimony the Court found significant, as Mother should have been encouraging a relationship between the minor child and Father.

7. The Court believes that Mother determined [Father] was not good father material and as a result did not want him involved in the minor child's life, but this was not Mother's decision to make.

8. Father then relocated to Illinois, where the majority of his family resides. Father continued to FaceTime with the minor child, and Mother allowed him to maintain contact with the minor child until late 2017, at which point his attempts at contact went unanswered.

. . . .

26. The Court finds Father's testimony that he attempted to see the minor child but that Mother obstructed him to be significant. Father did not previously take the aggressive action that he needed to be the dad. Father had other legal matters, to include several criminal matters as well as his daughter's parenting plan, that [at] least in part excused his failure to assert himself with regard to the minor child Archer sooner than he did. The best thing the Father has done is be before this Court fighting to be the dad.

27. During the months of March through July of 2018, the Court finds Father was working and able to pay support for the benefit of the minor child, but his excuse was that he did not know what address to send the support. This is no reason not to pay support for the benefit of the minor child, and Father should have driven to Tennessee and given money to Mother, regardless of whether she wanted support.

The trial court concluded that "[t]here [was] clear and convincing evidence that Father did not support the minor child" during the relevant four-month period, but that "[t]here [was] not clear and convincing evidence that Father willfully failed to visit or willfully abandoned the minor child pursuant to Tenn. Code Ann. § 36-1-113 and § 36-1-102" during this same period. With regard to its conclusion that Father did not abandon

Archer by failing to visit, the court explained, "There is enough evidence demonstrating that the Mother hampered Father's ability to visit the minor child and ability to maintain a relationship with the minor child."

Then, because it found Mother and Stepfather proved by clear and convincing evidence one ground for terminating Father's rights, the court conducted a best interest analysis to determine whether terminating Father's rights would be in Archer's best interest. The trial court addressed each element set forth in Tenn. Code Ann. § 36-1-113(i) and concluded that it was not in Archer's best interest for Father's parental rights to be terminated.

Mother and Stepfather appeal the trial court's judgment. They argue the trial court erred in failing to find that (1) the evidence clearly and convincingly proved that Father abandoned Archer by failing to visit him during the relevant four-month period and (2) terminating Father's rights to Archer was in Archer's best interest. Father contends that the trial court erred by finding that the evidence clearly and convincingly established that he abandoned Archer by failing to provide for his support.

II. STANDARD OF REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial

action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (citing U.S. CONST. amend. XIV, § 1; TENN. CONST. art. 1, § 8). While this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, and a parent's rights may be terminated only where a statutory basis exists. *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a parent's rights. *Id.* "When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the

demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)).

If a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251. "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination," *id.* at 254, and the existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child," *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

### III. ANALYSIS

#### A. Grounds for Termination

##### 1. Abandonment by Failure to Visit

One ground for terminating a parent's rights is abandonment, as that term is defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). Mother and Stepfather alleged that Father abandoned Archer by failing to visit or support him within the four months preceding the date they filed their termination petition. When Mother and Stepfather filed their petition on July 6, 2018, "abandonment" was defined, in relevant part, as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2018). The statute defines the phrase "failed to visit" as:

> the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period[.]

*Id.* § 36-1-102(1)(E). The statute defines the phrase "token visitation" as:

visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]

*Id.* § 36-1-102(1) (C).

Although a petitioner is no longer required to prove the respondent in a termination proceeding acted "willfully" in failing to visit or support his or her child,[1] the respondent may assert as an affirmative defense that his or her failure to visit or support was not "willful." According to the statute,

For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

*Id.* § 36-1-102(1)(I) (2018). Because willfulness is an affirmative defense, the burden of proof is on Father to establish that his failure to visit was not willful. *See In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *5 (Tenn. Ct. App. Nov. 26, 2019); *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *13 (Tenn. Ct. App. July 15, 2019).

"Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d at 863. We have previously stated that "willfulness" does not "require malevolence or ill will." *Id.*

Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her*

---

[1] Until July 1, 2018, the petitioner was required to prove the respondent(s) "have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]" Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017).

*duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child*[.]

*Id.* at 863-64 (citations omitted) (emphasis added); *see also In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control."); *In re Kolton C.*, 2019 WL 6341042, at *5. Whether Father failed to visit Archer is a question of fact. *See In re Adoption of Angela E.*, 402 S.W.3d at 640. Whether he proved that his failure to visit was not willful is a question of law that we review de novo, according the trial court's determination no presumption of correctness. *See In re Kolton C.*, 2019 WL 6341042, at *5.

Mother and Stepfather filed their termination petition on July 6, 2018. Thus, the relevant four-month period is March 6, 2018, through July 5, 2018. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that statutory four-month period covers four months preceding day termination petition was filed and does not include day petition was filed). Father lived in Illinois throughout this four-month period, and he testified that he tried, without success, to communicate with Mother and set up a time for him to travel to Tennessee to visit with Archer from the end of 2017 through July 2018. He testified that his texts to Mother stopped being delivered and his calls would ring once before going to voicemail. When Mother reached out to Father by email in April 2018, Father asked how Archer was doing and asked Mother to send him photos of Archer. Mother did not respond to Father's inquiry and request for photos; she only seemed interested in obtaining Father's consent to terminate his rights. On May 10 and May 24, 2018, Father asked Mother in an email for photos. On May 11 and May 14, 2018, Father sent emails to Mother expressing his desire to have a relationship with Archer and for his daughter and Archer to have a relationship as well. On June 7, 2018, Father asked Mother in an email if he and his daughter could see Archer when Father came down to meet with his lawyer. The final email Father sent Mother before she and Stepfather filed the termination petition was dated June 14, 2018. In this email, Father asked Mother for a "time between June 30th and July 7th" when Father and his daughter could see Archer so all three of them could spend time together.

This is not a case in which a parent has abandoned his child by failing to visit within the meaning of Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i). Rather, this is a case in which the custodial parent has interfered with and thwarted the noncustodial parent's ability to visit with the child and develop a relationship. *See In re Audrey S.*, 182 S.W.3d at 863-64. "'[W]hen a parent attempts to visit his child but is "thwarted by the acts of others," the failure to visit is not willful.'" *In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *5 (Tenn. Ct. App. Dec. 22, 2016) (quoting *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009)). We conclude that Father has proved by a preponderance of the evidence that his failure to visit Archer within the

relevant four-month period was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I) (2018). Accordingly, we affirm the trial court's determination that Mother and Stepfather failed to establish by clear and convincing evidence that Father abandoned Archer by failing to visit him in the four months preceding their filing of the petition to terminate Father's rights.

2. Abandonment by Failure to Support

Similar to the termination ground of abandonment by failure to visit, Tenn. Code Ann. § 36-1-102(1)(A)(i) also defines abandonment as a parent's failure to support or make reasonable payments towards the support of a child for a period of four consecutive months immediately preceding the filing of a termination petition. When Mother and Stepfather filed their termination petition, the statute defined "failed to support" as follows:

> the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period[.]

Tenn. Code Ann. § 36-1-102(1)(D) (2018).

The evidence is undisputed that Father did not support or make reasonable payments towards the support of Archer during the relevant period, March 6, 2018, through July 5, 2018. Father testified that he was employed during that period and that he had the means to support Archer. He contends that his failure to contribute towards Archer's support was not willful. He asserts that he made no support payments because he did not know Mother's mailing address during the relevant four-month time period; Mother never requested any money from him; when he offered to contribute in 2017, Mother had said he did not need to worry about it; and no court had entered an order requiring him to pay child support.

According to Father, Mother hindered him from contributing financially towards Archer's welfare. "[A]ttempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially." *In re Audrey S.*, 182 S.W.3d at 864. Moreover, the legislature presumes a parent who is at least eighteen years old is aware of his or her obligation to support his or her child, regardless of whether a court has entered an order requiring child support to be paid. Tenn. Code Ann. § 36-1-102(1)(H); *see also In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017) ("[I]t is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place.").

As the trial court found, Father is not relieved of the obligation to contribute towards Archer's support because he did not know Mother's mailing address or because she refused to arrange a time for Father to see Archer. He could have submitted child support payments to the Juvenile Court if he did not know where else to mail support payments. We find that Father has failed to establish by a preponderance of the evidence that his failure to pay support for Archer within the four months preceding the filing of the termination petition was not willful. We affirm the trial court's determination that Mother and Stepfather proved by clear and convincing evidence that Father abandoned Archer by failing to support him within the meaning of Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i).

B. Best Interest Analysis

Having found that clear and convincing evidence was introduced to support a ground for terminating Father's parental rights, we next consider whether the trial court properly determined that termination of Father's rights was not in Archer's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. When considering the statutory factors, "courts must remember that '[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective.'" *In re Gabriella D.*, 531 S.W.3d at 681 (quoting *In re Audrey S.*, 182 S.W.3d at 878); *see also White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004) (stating parent's and child's interests diverge once ground for termination has been proved by clear and convincing evidence). "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d).

"Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although [Petitioners] must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah S.*, 455 S.W.3d at 555); *see also In re Gabriella D.*, 531 S.W.3d at 681. The factors a trial court is to consider when conducting a best interest analysis are set forth in Tenn. Code Ann. § 36-1-113(i). The trial court here reviewed each of the factors set forth in the statute and applied them to the facts of this case. The court wrote:

> 32. The best interests of the minor child, as outlined in § 36-1-113(i) are found as follows:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

- 11 -

There is no proof that Father's home is unsafe and no proof that Father cannot take care of the minor child. The Court finds this to be neutral, as the Court's decision today would not be a change in the primary parent.

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

Father's living situation is better and more stable, but this factor is more applicable when the Department of Children's Services is involved.

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

Father has not maintained regular visitation with the child, but as the Court has found, this has not been strictly willful on Father's part.

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

A meaningful relationship has not been established between Father and child, but again, this is not willful on Father's part. Father wants to be a Father, and the minor child is only two and a half years old, and at a young age where such a meaningful relationship can be established.

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

There would be no major change if there is no termination of Father's parental rights, as Mother would remain the primary residential parent. The minor child, at the young age of two and a half years old, would be able to adapt.

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

This factor is not applicable.

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

Father's home, as evidenced by the photographs submitted, looks to be a reasonable and nice home. There is no evidence of criminal activity in the home and no evidence of such use of alcohol or drugs as may render Father unable to care for the child in a safe and stable manner. Father took and passed a drug screen at the direction of the Court, following the final hearing in this matter. This further establishes Father's credibility with the Court.

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

There is no proof by a preponderance of the evidence that the Father has any mental or emotional problem that would affect his parenting in any manner.

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Father has not paid child support. This is not a case involving the Department of Children's Services.

33. It is not in the best interests of the minor child to terminate Father's parental rights. This is something that affects the minor child for the rest of his life, including his adult life, not to have a parent. The minor child should have both of his parents. The minor child has a sister Lilliana who the minor child should know. The minor child has a grandmother, the Father's mother, and the minor child should know her and [the] rest of the Father's family. It is better to have more people who love and care for the minor child, rather than fewer people. There is nothing wrong with the minor child having two dads, both the Father and the Step-Father.

Father's girlfriend, C.M., testified at the trial on Father's behalf. Ms. M. has a five-year-old daughter who lives with her and Father, and she testified that Father

- 13 -

interacted well with her daughter. Ms. M. testified that the three of them ride bikes, play board games, read, and play soccer together. Ms. M.'s daughter plays T-ball, and she stated that Father helps transport her to practices. When asked whether she "had any concerns about [Father] being around [her child]," the Ms. M. replied, "Never." Ms. M. also testified about how Father acts around his daughter, Lilliana. She said, "He takes care of her needs. He's there for her. He plays with her, interacts with her. He wants, you know, to be the best dad that he can for her." Photos of a four-bedroom house where Father and Ms. M. live were introduced into evidence. Father testified that they have set aside one of the bedrooms for Archer.

Mother relies on the case *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004), to support her argument that it is in Archer's best interest for Father's rights to be terminated. The child at issue in *Moody* was eleven years old when her father's parental rights were terminated. *Moody*, 171 S.W.3d at 189, 191. The facts are similar to those in this case to the extent that the parents in each case did not stay together for long once their child was born and the mothers in each case married other men who wanted to adopt the children at issue. *Id.* at 189-90. The similarities stop there, however. The mother in *Moody* did not interfere with the father's continuing relationship with the child as Mother did in this case, and the father in *Moody* had only sporadic interactions with his child, making only one telephone call and sending only one card to the child during a sixteen-month period when the child was four and five years old. *Id.* at 190. A clinical psychologist testified in *Moody* that the child at issue felt "no connection" with the father, the father "had frequently violated [the child's] trust by breaking promises to telephone her or to send her presents," and that the father's conduct upset the child. *Id.* at 191.

In this case, by contrast, Father has made numerous efforts to visit with Archer, but his efforts have been thwarted by Mother. Unlike *Moody*, Mother has prevented Father from developing any sort of relationship with Archer. As the trial court found, Archer is still young enough that Father should be able to establish a meaningful relationship with him. We agree with the trial court's determination that Mother and Stepfather have failed to prove by clear and convincing evidence that terminating Father's rights is in Archer's best interest. We, therefore, affirm the trial court's judgment denying Mother and Stepfather's petition to terminate Father's parental rights to Archer.

IV. CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded, with costs of appeal assessed against the appellants, K.T. and T.T., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE